Our next case is Park v. Temple University, number 18-1891. Good morning, Your Honor. Good morning. May it please the Court, my name is Joseph Montgomery. I represent the appellant, Dr. Sean Park. I respectfully request three minutes of time for rebuttal. That will be granted. Thank you. May I proceed? Please. In this case, we have the unique opportunity to examine the interplay between Matthews v. Eldridge, due process, res judicata, bias, in the university disciplinary setting in a disciplinary hearing that in a set of indistinguishable disciplinary hearings. So in this case, by way of a brief history, just to make a little bit of sense, Dr. Park voluntarily surrendered his medical license in California. He had a period of time where he was not able to practice as a doctor as he previously practiced. So he decided to keep the dexterity in his fingers and further his education, so he applied to schools. He applied to some schools that asked about his disciplinary history. He applied to some schools that didn't. He got into some that asked, got into some that didn't. He wasn't scouting out a school that didn't ask about his disciplinary history. He was accepted into Temple University, Kornberg School of Dental. We're well familiar with all the facts. Right. So really, ultimately, Dr. Park was tried. There was a hearing. There was a disciplinary honor board hearing under a section of Temple's code that it's a broad piece of code, a broad piece of honor code that you can fit a lot of different facts through. You can fit a lot of different fact patterns through, and I think that's by design. So the code specifically states that, of course, indulgences for one moment. The code specifically states that he was charged with providing false or misleading information, verbally or in writing, to the university or university personnel. This includes but is not limited to. And there's an A, B and C under this. So we understand that your your your contention here is that applying the Matthews versus Eldredge balancing factors, that a disciplinary process at a state university needs to include claim preclusion or race judicata concepts or doctrine. But why is that essential to assuring what Matthews versus Eldredge is intended to do? And that is to ensure that there's at least fundamental fairness in the proceeding. Here he had notice of the charges, a right to be heard, etc. All right. Thank you, Judge. So any notion of fundamental fairness is really gone. If you don't like the result of the hearing, you can try the exact same fact pattern, the exact same fact. The exact same cause of action again. Right. So then if we disagree with that premise that the second charges were the exact same as the first, then you lose. Right. So exact. So then I think we have to look at the wording. So it exact same. I think we could meet an exact same burden. That would be the strictest, the strictest burden, the exact same. I think the language in Doe versus George Mason, where it says bringing new charges that were or could have been brought in the first instance to do otherwise, that schools must, universities must, to do otherwise. Courts have suggested would create a perverse incentive for universities to hold back related charges with the aim of securing a second bite at the disciplinary apple. So even if you don't want to take such a nefarious position, how about it's just judicial economy. Right. So if the charge could have been brought and should have been brought, then you should bring it so that we're not worst case scenario, deliberately holding back charges that should be brought. So we can try it one, two, three, four, five times. Theoretically, more than that. But in addition to that, who's got who's got the burden here to raise race judicata? You've been saying, in effect, this requires the highest kind of due process protections and race judicata because of that should apply in in court proceedings. Rest you caught it is an affirmative defense. It's the burden is placed on the person who wants to invoke it to invoke it. It's not put on the tribunal to bring it up. If if the burden was on your client to invoke race judicata, where is there in any of this record that he said to the panel? Wait a second. I object either in the appeal or at the time. Absolutely. Thank you, Your Honor. So the two hearings were so strikingly similar that at the point the second hearing began, Dr. Well, he was certainly aware of it by the time he was appealing. Right. So at the appeal issue, that's when we first brought up the issue that we've already been found that probation in the first instance, probation. It was the same determination in both. Yeah. It was the argument ever made to Temple University. You're barred by the doctor of race judicata from considering this second charge, assuming for the sake of discussion here. That not disclosing something which they say was called for an application. I understand there's a dispute about that. I'm sorry, Your Honor, I may have misspoke. So as far as the the informal appeals, as far as the the first that we learned of the first charge actually coming to a completion, was through the discovery phase when we received audio transcripts of the hearing. So Dr. Park was only informed through the discovery process that at the end of the honor board proceeding, after the team goes into the back and deliberates, they come back out and they read their verdict early into the record. It's a recommendation, right? So precisely. So and I thought it's not a they make a recommendation. The actual punishment to be imposed is decided by the dean, according to the rules. In fact, it is. And the dean in this case and certain times in the deans referred to different pronouns or in different ways because it's the same person. And it's not just the rest judicata. Is is an argument we're making and we believe in it and we think that just to step back, this is something that we don't see often because it's so ingrained in our system that you just don't try people twice for the same for the same infraction. Back to your point. Yes. The way the temple is structured. Ultimately, Dean Ishmael would make the determination. Right. But if he could just overturn a determination made by the honor board, it would really be a decision by Fiat. Right. But but he is entitled to do that. He is. He was by the terms of the disciplinary process that they've got in place. His was the decision that was controlling and it was within his discretion to decide what the what the condign punishment would be for what the honor board decided was an infraction. Correct. Absolutely. And if I may. So this goes towards our bias argument, Judge Jordan, in that Dr. Ishmael not only convened the panel. Right. He not only gets to make the ultimate determination of if he agreed with the panel, but the underlying issue is a conversation that he had with Dr. Park. So is your attack really that that temples process all by itself? Not how it worked in this case, but the fact that the dean gets to make the decision that that is fundamentally unfair and contrary to due process. So for argument's sake, let me say that that's not fundamentally unfair in and of itself. That the dean gets to make that decision. But in this. And it makes sense that maybe there's a release valve under the table where one person does ultimately get to control. The panel goes rogue. I get this in the university setting. But in this case, right where where it's flawed is that this person was involved in every step of the way. And there's case law that says it's going to be the case with the way their system is set up. So that's why I'm struggling here a little bit to get to where you want to get. It sounds like what you have to say is this system, the way Temple has established it, is in its very essence fundamentally unfair. Because what you're saying here can be the case in every case that the dean gets to make these decisions and will be involved and can be involved in all of the decision making. If we consider that a university setting, especially a dental setting, is perhaps a smaller setting than other larger settings. There is a chance or a likelihood that the dean may be involved in the underlying issue. So we're talking about a conversation that Dr. Park had. So what they're saying they were charging Dr. Park with in the second hearing was that he lied to Dr. Ishmael. So you lied to Dr. Ishmael. So Dr. Ishmael gets to convene a panel to determine whether you lied to Dr. Ishmael. And if Dr. Ishmael doesn't like the result of the panel, Dr. Ishmael gets to make the final determination. So is that where the problem is? Are you saying that Dean Ishmael should have been recused? Dean Ishmael absolutely should have been recused. So that's just one instance of bias. What are the other instances of bias? Again, what led to Dr. Park initially believing that the second hearing was actually a continuation of the first was it was 80 percent the same exact panel. So it's a panel of five, three faculty. And I would argue that the faculty are the most important people on the panel because not important, but I would think that the faculty are getting their orders from Dean Ishmael. There are two students on the panel. One of the students was the same. Only one, bottom line is only one person on the panel was different. I understand, Patrick, the composition of the panel. So the composition of the panel in Temple's own policies, the panel should be a clean slate. When you go in there, it should be a fresh panel. They're not supposed to talk about the issues. It's the exact same panel minus one student on the second hearing. Not only that, it's the exact same one witness, Dr. Spiroza. And not only that, she's reading from a prepared transcript. Essentially, if you compare the two documents, the exact same statement. In the first hearing, Dr. Spiroza stated, we wouldn't be here if it wasn't for you lying in this informal June 2nd conversation. I understand. We're with you. I mean, we know we spent a lot of time on this, so we know the facts. Your argument requires the assumption that collateral estoppel res judicata is a feature of due process. You cite the Duval case in your opening brief. Not for this point, but in the Duval case, we said, collateral estoppel is not constitutionally mandated, unquote. That that is instead something that, now, we dropped a footnote and said, perhaps substantive due process would offer some protection against repeated relitigation of the same issue by an administrative agency. But as a matter of ordinary due process, collateral estoppel, we have said, is not constitutionally mandated. How do you meet that precedent? I think that's where we go back to Matthews, Your Honor, where we say Matthews is beautiful because it's a sliding scale. And depending on the property interest, and it's also called an economic test, right? So depending on the economic cost to the school, it's what extra or different procedure should be put in place. So we're actually arguing to save the school money. I'm pretty sure they're grateful for your concern at this point. Right. And, you know, it's almost, and it was like kind of laughing, reading, and maybe I shouldn't, but their argument was, what do you mean? We gave you extra due process. You've got two hearings. What more do you want? You had your two hearings, and they're both the same hearing until they got the answer they want. So it's really saying, charge correctly, charge correctly the first time, save government resources, and ultimately everyone's property interest will be protected. Let me ask you a sort of more abstract question. You seem to be arguing we're entitled to a second decider, basically, in these circumstances. What if, could that be extrapolated to the actual court setting? I mean, would then anybody who loses in a bench trial be able to say, I get a second decider, I get a second district judge, this guy knows about the case, so I'm entitled to get the person next door? So, and no, right, no, and judges often, as you know, try the same type of case all the time, right? And you know, hey, I got this judge, this is great, they tried this case, and you know how they may be predisposed to rule, and there's even been cases. Well, no, no, I'm talking about the exact same case. Let's say, you know, in the courtroom down on, you know, the fourth floor, they go against you, you appeal, we agree with you, and it goes back to, are you saying it can't go back to that same judge? I, right, if everybody knows that it's an appeal and that's what it is, then it's different. If there's a final verdict and a final determination, and in that case, to protect people that may detrimentally rely on the determination, to protect all the other interests. I'm saying as a due process matter, does your client get a different judge? As a due process matter. Because the first one knows about your case, has heard the testimony. Right, so if they're retrying, if it's an appeal that gets kicked back to a lower court, for instance, right, so in that case, we know what we're doing. Going to retry the case. We're retrying the case, but we know we're retrying the case, right? So here, they're retrying the case, but they're doing it, they're pretending not to be retrying the case, right? So if that, so I don't know why there would be, so as far as Temple's policies go, right, they say that there should be a clean slate. So their policies can bind them to stricter regulations. And in the Fury case, a Temple case in this circuit, the court did find that substantial deviation from your own policy is enough. In Fury, it was minimal. I think you're going beyond my question now. So it goes back to their own policy that they set for themselves. They set their own standards, and they violated their own standards by using the tainted panel. Okay, thank you. We'll hear from your adversary. Thank you, your honors. May it please the court. My name is Neil Hamburg. I represent Temple University. There's a big, there are a couple of red herrings that I'd sort of like to deal with.   The first decision was not final until the dean issued his sanction, and he found expulsion in the first appendix number 488. He explicitly finds the sanctions university expulsion for the first one. Does he find that after the second hearing? Yes. Right. Now, you've taken the position that these were two separate hearings because they were two separate charges, but I'm wondering how that squares up with the record when Dr. Spraza, if I'm saying her name correctly, testified about the June 2nd meeting and said it was with Park's failure to provide his original explanation and presenting false information at the June 2nd meeting that led to the first hearing. I mean, in other words, it sounded like she was saying both things led to the first hearing. So if both things led to the first hearing, why was there a second hearing? Well, your honor, I think it is not, I think res judicata is not the right analysis here. I think, and it sort of goes to what Judge Chigaris was saying, suppose a district court, let's take the district court setting, you have jury trials. You can bifurcate, you can trifurcate. The same jury hears things. Yeah, but the jury is told now we're going to hear this piece, now we're going to hear that piece. And their view of caution that we're getting from Mr. Park is, as you well know, they had a hearing and it was on the very same things. It wasn't two different things. It wasn't one is about failure to disclose and the other is about misleading. Both things were going on at the same time in the first hearing and in the second hearing. The only difference was Dr. Ismael did not like, Dean Ismael did not like what the first board told him. And so until he got the answer he wanted, he was convening another board. And there's, we're here on a motion to dismiss. There are allegations in that complaint viewed in the light most favorable to Mr. Park that could certainly lead one to say, well, that looks like what's going on. Dean Ismael just did not like hearing probation. He wanted to hear expulsion and we were going to run this obstacle course until that's where it ended. So on a motion to dismiss, why would we say, yeah, he just hasn't said enough. He's got no legal claim at all that there's a process violation here. We're here on a motion to dismiss because I didn't write the opinion, Your Honor, which is another issue in the interest of candor I would like to discuss. The other one, I do not think that Judge Ditter appropriately dismissed the state court claims. Well, let's leave the state court claims aside for a second. But I would have had him decide summary judgment on all the claims. But he didn't, right? He did not. Right. So we are here on motion to dismiss. We are bound by those standards and that's why I'm asking the question to you the way I'm asking it. Although I would suggest, Your Honor, that you can take the whole record into account and you can affirm the law is clear, the Third Circuit has. Well, we know that. We know we can affirm on any grounds, even if the district court didn't reach it, but also our standard course is let the district court decide in the first instance. Temple's procedures complied completely with due process. They're university procedures. It is not the same process as criminal trials. The law is clear. The law is clear in every court in the nation. But as Judge Jordan says, though, the procedural posture is very important here. If it's a summary judgment opinion, that's one thing. But it appears that in spots all reasonable inferences are not going in favor of your adversary. There appear to be some value judgments there, and that may not be a good thing at this point, right? The fact is that the record does not support allegations in which Your Honor may be questioning inferences. Well, we're really worried about the complaint at this point, the First Amendment complaint at this point, right? The First Amendment, yes. Yeah, that's the issue. You have to defend this. You know, whether you're in the posture you'd like to be or not, you are in the posture that you're in, which is defending a motion to dismiss in your client's favor. And the challenge that we're asking you to help us deal with is the complaint is relatively detailed in saying, Dean Ismail had it in for me that we had a hearing. The hearing didn't come out the way he liked without any additional notice to me. Very shortly thereafter, there's another hearing where he gets the result he wants. This was a product of bias. And you can, from the facts I'm giving you, you can understand or infer the bias of the dean and the assertion that, you know, this was, as they put it in their brief, quoting Professor Mark, heads I win, tails we keep doing it over until I win. I would suggest, Your Honor, that the verdict came out the way Dean Ismail wanted. It was the recommendation that they want from the panel. But in the academic system that Temple has set up, the dean is the one that has the authority to determine sanction. The finding, if you applied res judicata, there's expulsion. That's what res judicata would suggest. If you didn't have the second hearing, there is a finding of responsibility and a sanction of expulsion. What they want is to have a non-final recommendation be the thing that affects res judicata. None of the res judicata cases, Matthews included, requires anything other than a final decision. Is it possible to make the, for a system to be not in the abstract unfair, but to be operated in a manner which is biased and in application be unfair? Yes, Your Honor. And we have a full record and a motion for summary judgment and a full response. And from our point of view, summary judgment is mandated on every single count, both because there are not causes of action stated and because there is zero evidence of actual bias. Is that a concession, Mr. Hamburg, that in order to get where you want to get, we do, in fact, have to move off the motion to dismiss standard and we have to take a summary judgment approach here? I would like the court to do that. I believe the pleading is deficient on its face, but in light of the entire record, I think it is much more powerful as a summary judgment on every single count. There is zero evidence of bias, of the dean is cherry picking, the dean didn't like the recommendation, so we had a second hearing. There's zero evidence that the dean is cherry picking his own panel. Can you point us in the record where the application called for the revealing of the suspension of Dr. Park's licenses? Where's the question that required him to give that information? There is not that question explicit, but it is implicit that people give truthful answers. I'm with you, they're supposed to give truthful answers, but there seems to be a fundamental disconnect here. The first hearing by Temple's account is that he was misleading in his application, and I'm trying to find out what you point to in his application that was misleading. Where did you ask for information that he should have properly have said, and my license in California and Texas was suspended? It is explicit in the permit. I'm blanking on the name. The temporary permit? The permit to be a student dentist. I went back and I looked at the application as it's in the joint appendix, and maybe this is not a full record of the thing, but I went through it several times, and I wasn't able to see the question, and they say there was no question, so this is just my opportunity. I'm just asking you if you can point us to where in this application, this all starts with the assertion that you misled us at the jump, and he says, I didn't. You never asked a question, and I wasn't trying to hide anything. There was never an inquiry about it. Where was there an inquiry about it? There was in the conversation with the dean and the other two administrators. That's later, right? Your Honor, I'm not going to make up facts. Okay, good. So there wasn't a question? It was not that explicit question, but there is a duty, just as I have a duty of candor to this court, there's a duty of candor when students are applying. But if there's no question that says, tell us about your licensure, I'm a little surprised there wasn't, but it doesn't look like there was. So if this all begins with, hey, you didn't tell us your license was suspended, and his response is, you didn't ask me anything about it, and then it becomes, well, you didn't tell us the truth, and we didn't like the way you responded when we started asking these questions. Does that begin to raise a question of bias on the part of the board that there was, you know, we're bugged that you didn't tell us this in the first place, even though we didn't ask it, and now you're going to get expelled, period? I'm back to the motion to dismiss piece. I got that. Yeah. I mean, it would be a stronger, I would have a stronger position here, admittedly, if this were a decision on summary judgment. And I would request that this court entertain the motion for summary judgment as we suggested, rather than sending it back. The procedural history of what happens here is they file this complaint, we make a motion to dismiss, Judge Beadlestone grants it and lets them, and then we have this whole discovery, and then we have another motion to dismiss on the amended. First amended complaint. First amended complaint, and then we have discovery, which is expensive and time-consuming for everybody, and then we make our motion for summary judgment, and there's a full record. And I, if I had my druthers, I would have. You would have gotten a summary judgment motion granted, not the motion to dismiss. Exactly. Right. Because there is, the inferences that he wants to draw are. By the record. Yes. We get your position. Judge Ditter did not address the state law stuff. He appeared to treat it like it was supplemental jurisdiction, but it was pled as diversity. Correct. Isn't that just automatically right there, problematic? That is. We have to send that back, don't we? No. I think that you can de novo analyze the complaint and analyze the summary judgment and affirm on a different ground than Judge Ditter. I mean, there's been a lot of, just as this court has spent a lot of time looking at this record, if you send it back, I don't know that Judge Ditter would necessarily get it. Another judge would have to dig through this complicated record. And I respectfully request it is wrong. There's diversity jurisdiction. The plaintiff is entitled to have the state court claims dismissed on summary judgment. And we can decide that. And you can decide that. Okay. Thank you. Thank you, counsel. Thank you. Go ahead. So if I can just make one clarification, and I believe it may be clear. I just want to be extra clear about the first claim charge and the second claim charge. In the actual charging for the first claim, it wasn't until after that it was distinguished to be for the admission. In the actual charging for the first claim, it was really just left wide open as far as any really lack of candor. Can you respond to Mr. Hamburg's point that the punishment levied on the first charge was expulsion? So if you got raised judicata, you just get expulsion because that was the final decision of the dean. So then the question I would have is what would be the need for the second hearing since there was nothing new in the second hearing. It was the same. We were just saying, hey, let's look at it from the left instead of the right. So the first hearing was probation. The second hearing was the exact same. When you say the first hearing was probation, I mean, that's the point that Mr. Hamburg is making. Right. That it wasn't a final decision until the dean rendered a final decision. And his final decision as to the first charge, the first hearing, was expulsion. And that was in keeping with Temple's process. So it's just like it's a technical legal argument. If, according to their process, you get expulsion for the first and you ask for raised judicata, you still get expulsion, how are you ahead of the game? What's the answer to that? Right. So I think what I heard Mr. Hamburg say was that the expulsion determination wasn't made until the conclusion of both hearings. So it's my understanding that Dr. Ishmael knew about the board's determination after the first hearing but waited until the second exact same hearing before making. So it's just that he waited until he had the cards he wanted to play before he made the final determination. So had it had been made after the first hearing and not after the second same exact hearing, very essentially similar, substantially identical hearing, then I would be more persuaded by that. But the fact that it wasn't made until after both hearings. Now, with respect to Judge Jordan's question on the application itself, now the Temple application did not require disclosure of the licensure suspension. But did the standard application that Temple also used, the American Dental Education Association post-doctoral application support service application require it? Temple has pointed us to nothing that... It was in the testimony. In the testimony. At, I think, page 283 of the joint appendix? That it would require it? We, in your honor, we did not see anything that would have, that Sean hid from Temple or from the licensing board. In fact, again, and nothing Sean did was illegal. So the application beyond that, he was operating on actual patients and, you know, as to our state claims for unjust enrichment, making Temple a lot of money. He was doing, he's doing complex oral surgeries, and there's been no indication that anything he's done could have led to any malpractice or anything illegal or anything else. So, no, no, your honor. Okay. Well, thank you, counsel. Thank you very much. We thank both counsel for their excellent arguments, their excellent briefing. We'll take the case under advisement.